UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| JAMES GORSUCH, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 4:09CV45SNLJ |
| FORMTEK METAL FORMING, INC., d/b/a Dahlstrom Industries, | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff has filed this product liability/personal injury lawsuit alleging injuries due to a defective decoiling machine. This matter is before the Court on the defendant's motion for summary judgment [31], filed March 17, 2010. Following resolution of settlement negotiations, and extensive responsive briefing, this matter is now ripe for resolution.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v.

Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); *see*, Mayer v. Nextel West Corp., 318 F.3d. 803, 806 (8th Cir. 2003) *citing* Keathley v. Ameritech Corp., 187 F.3d. 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Systems, Inc., 348 F.3d. 732, 733-34 (8th Cir. 2003) *quoting* Wilson v. Int'l Bus. Mach. Corp., 62 F.3d. 237, 241 (8th Cir. 1995); Girten v. McRentals, Inc., 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and

speculation than evidence, it is insufficient to withstand summary judgment."). Thus, the nonmoving party cannot rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d. 953, 957 (8th Cir. 1995). With these principles in mind, the Court turns to an examination of the facts.[1]

On or about May 2, 2007, plaintiff was severely injured while performing maintenance on a piece of machinery known as a "straightener".[2] At the time of his accident, plaintiff was working at his job at Trilla Steel Drum Corp. (n/k/a Greif Bros.) at a facility in Fenton, Missouri. The subject straightener is a component part of a machine line known as a "cut-to-length" line. The subject cut-to-length line and straightener were manufactured in 1976 by Dahlstrom Machine Works (Dahlstrom) of Schiller Park, Illinois. Defendant Formtek Metal Forming (FMF) did not design, manufacture, sell, install or service the cut-to-length line or the straightener in which the plaintiff was injured.[3] FMF has never designed, manufactured or sold cut-to-length lines or straighteners for use in cut-to-length lines.[4]

---

[1]The Court's recitation of facts is largely taken from the parties' pleadings. The pertinent facts, germane to the legal issue presented in the instant motion, are recited by the Court. Upon review of the parties' pleadings, it appears that the facts pertinent to the legal issue pending before the Court are not disputed but rather the dispute concerns differing opinions as to the legal effect of these facts. Where the pertinent facts are significantly disputed, such dispute will be noted.

[2]The parties greatly dispute the exact circumstances as to how plaintiff was injured; however, as regards the instant summary judgment motion, this factual dispute is irrelevant.

[3]The parties dispute legal liability based upon whether FMF can be considered the manufacturer or designer of the subject machinery. However, based upon purely factual grounds, FMF did not design or manufacture the subject machinery in 1976, nor had serviced the subject machinery during the relevant time-period. *See*, Plaintiff's Exhibit 2 - Deposition of Darren Muchnicki, pgs. 34-35; Plaintiff's Exhibit 3 - Deposition of Darren Muchnicki, pgs. 114-15.

[4]*See*, Footnote #3.

On or about August 8, 1996 Formtek, Inc. entered into a purchase agreement for the purchase of certain assets of Dahlstrom, Industries. Defendant's Exhibit E.[5] The purchase agreement (hereinafter referred to as "APA") not only included the transfer of certain assets, but also included the purchase of the facility and real property in Schiller Park, Illinois that housed Dahlstrom Industries.

Pursuant to the terms of the APA, certain assets were sold/transferred:

> "1.1 The Assets. Upon the closing of the transactions contemplated under this Agreement on August 30, 1996, or such other date as mutually agreed by the parties (the `Closing Date'), and subject to the terms and conditions contained in this Agreement, Seller **[Dahlstrom Industries]** shall sell, transfer, convey, assign and deliver to Purchaser **[Formtek, Inc.]**, and Purchaser shall purchase, acquire, and accept from Seller, free and clear of all liens, encumbrances, restrictions and adverse charges of any nature whatsoever, except as may be permitted by Section 7.7, all of the assets, rights, interests, properties and goodwill of every nature whatsoever, tangible or intangible and wheresoever situated, required or appropriate for the continued operation of the Dahlstrom Business which is further defined as the manufacture, application, design, development, engineering, distribution and sale of various models and types of machinery and equipment for the feeding, straightening, forming, bending, notching, welding, stacking and other activities involved in the automated fabricating systems, and the parts and accessories related thereto set forth by model number in Schedule 1.1 attached hereto."

Defendant's Exhibit E. The APA then sets forth the particulars as to which assets were sold/transferred from Dahlstrom Industries to Formtek, Inc. Furthermore, certain assets were specifically excluded from the APA. Defendant's Exhibit E, §2.

Prior to the sale transaction in 1996, Dahlstrom Industries had been in the business of making cut-to-length lines (including the subject straightener), roll-forming machines and

---

[5] In several instances, the parties have submitted to the Court identical exhibits; e.g. Defendant's Exhibit E is the same as Plaintiff's Exhibit 1. Whenever identical exhibits are filed, the Court, for purposes of clarity and judicial efficiency, will cite to only one exhibit. Whichever exhibit is cited is not any indication of bias or partiality by the Court.

flexible fabrication equipment. As of the time of the 1996 APA, Dahlstrom Industries was no longer in the cut-to-length lines business.

Pursuant to the terms of the 1996 APA, Formtek, Inc. specifically disclaimed any and all products and professional liability arising from or in connection with the Dahlstrom business for products manufactured or services performed on or before the August 8, 1996 closing date. Section 5.3 of the APA, entitled <u>Limits on Assumption</u>, reads as follows:

> "Except for the assumptions or discharges of liabilities described in Sections 5.1 and 5.2, Purchaser shall not assume (a) other liabilities, obligations and commitments of Seller, whether fixed or contingent, legal or equitable, mature or inchoate, written or oral, express or implied, known or unknown, including, but not limited to those related to taxes, employment practices, employee benefits and pensions, implied warranties, products or professional liability, and environmental, health, and safety obligations all as related to, arising from or in connection with the Dahlstrom Business for products manufactured and services performed on or before the Closing Date and (b) those liabilities, obligations and commitments of Seller that arise after the Closing Date, and the indemnification provisions contained in <u>Article 16</u> of this Agreement shall apply to any liability of Seller which is not assumed by Purchaser and which is asserted or claimed by any person against Purchaser."

Defendant's Exhibit E.

The APA also contained a covenant not to compete prohibiting Dahlstrom Business from engaging in any type of competing business for a period of three (3) years. Defendant's Exhibit E, §6.1.

Pursuant to the terms of the APA, the purchase price of $2,100,000.00 was paid in cash and no part of the purchase price was paid in stock. Defendant's Exhibit E, §3.3; Defendant's Exhibit F - Affidavit of R. Bruce Dewey. The purchase price was the result of an "arms-length transaction" and represented the fair market value for the assets purchased. Dewey Affidavit.

5

Shortly after the completion of the purchase, Dahlstrom Industries filed Articles of Incorporation with the Illinois Secretary of State's Office changing its name to Ivartek, Inc. Defendant's Exhibit H. Formtek, Inc. filed papers with the Illinois Secretary of State's Office to conduct business under the name of Dahlstrom/Formtek, Inc. Plaintiff's Exhibit 8. Defendant FMF was established sometime in 1997. Dewey Affidavit. Following the purchase of the Dahlstrom assets, Formtek, Inc. continued manufacturing and selling roll-forming, wing-bending, and Gripall material handling product lines under the Dahlstrom brand name. Dewey Affidavit; Plaintiff's Exhibit 3 - Deposition of Darren Muchnicki, pgs. 49-50. In 2001, the Schiller Park facility was closed, but the roll-forming business continued under the Dahlstrom brand name with defendant FMF. Muchnicki Deposition, pg. 52.

Before the execution of the APA, Dahlstrom and Formtek, Inc. had no shared officers, directors, debts, liabilities or business assets. Dewey Affidavit. Before the execution of the APA, Dahlstrom, Formtek, Inc., defendant FMF, and Formtek, Inc.'s and FMF's parent company Mestek, Inc. had no shared incorporators. Dewey Affidavit.

After the closing of the APA, no officer, director or stockholder of Dahlstrom became an officer, director or stockholder of Formtek, Inc., Mestek, Inc. or defendant FMF. However, after the closing of the APA, three (3) former shareholders and officers of Dahlstrom - Harold Williamson, James Williamson, and Burton Lowther - were hired by Formtek, Inc. to aid in the transition of the business operations. Plaintiff's Exhibit 6 - Dewey letter, dated September 9, 1996.[6] Both Williamsons and Lowther were hired by Formtek, Inc. pursuant to new employment

---

[6]This letter also references the employment of former Dahlstrom employees Frank Abbatecola and Eric Mosquera by Formtek, Inc. However, the employment of H. Williamson, J. Williamson, and Lowther is one of the more significant factors argued by the parties in their pleadings.

contracts. Plaintiff's Exhibit 12. Pursuant to these employment contracts, the Williamsons and Lowther were hired as "at-will" employees for a defined term and at a defined salary. James Williamson was given the title of Senior Vice-President of Operations and was responsible for production and manufacturing of product lines; and Lowther was given the title of Senior Vice-President of Sales/Marketing and was responsible for sales, marketing, and application and new product development engineering. All the former Dahlstrom employees reported to Charlie Weymouth, a Formtek, Inc. employee and general manager of the Schiller Park facility. Dewey Affidavit. None of the three former Dahlstrom officers joined the board or became corporate officers or directors of defendant FMF, Formtek, Inc. or Mestek, Inc. None of the former Dahlstrom officers were compensated with stock in FMF, Formtek, Inc. or Mestek, Inc. Dewey Affidavit. None of the former Dahlstrom officers were given any ownership interest in FMF, Formtek, Inc. or Mestek, Inc. Dewey Affidavit.

Just prior to the closing of the APA, Dewey sent out a letter to all of Dahlstrom Business vendors informing them of the sale. Plaintiff's Exhibit 9 - Dewey letter, dated August 22, 1996. In this letter, Dewey informs the vendors of the sale, and that "Formtek intends to continue operation of the Dahlstrom business in Schiller Park, Illinois under the name Dahlstrom Industries, Division of Formtek, Inc.". Plaintiff's Exhibit 9. It further informs them that in order to continue business with Formtek, Inc., and open an account for Dahlstrom Industries, Division of Formtek, Inc., the vendors had to complete new credit applications. Plaintiff's Exhibit 9.

On or about August 30, 1996 James Williamson, as President of Dahlstrom Industries, wrote Dahlstrom Industries' customers informing them that Dahlstrom Industries has sold "substantially all of its assets" to Formtek, Inc. He further informs them that Formtek, Inc. "will continue the manufacture of roll-forming equipment under the name of `Dahlstrom Industries,

7

Division of Formtek, Inc.'". Plaintiff's Exhibit 10. Lastly, he informs them to send payment on any outstanding invoices to Formtek, Inc. and any questions should be directed to R. Bruce Dewey. Plaintiff's Exhibit 10.

On or about the date of the closing of the APA, all employees of Dahlstrom Industries were given notice advising them of the purchase of the designated Dahlstrom assets by Formtek, Inc. Dewey Affidavit.[7]

Defendant FMF contends that it cannot be held liable as a successor-in-interest to Dahlstrom under Missouri's general rule of non-liability for asset purchasers; or any one of the exceptions to Missouri's general rule of non-liability for an asset purchaser. Plaintiff contends that there are issues of material fact as to whether or not FMF is a "mere continuation" of Dahlstrom; thereby, giving rise to successor liability.[8]

The general rule in Missouri is that when all of the assets of a corporation are sold or transferred the transferee is not liable for the transferor's debts and liabilities. Medicine Shoppe International, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d. 801, 803 (8th Cir. 2003); ARE Sikeston Ltd. Partnership v. Weslock National, et. al., 120 F.3d. 820, 828 (8th Cir. 1997); Wallace v. Dorsey Trailers Southeast, Inc., 849 F.2d. 341, 343 (8th Cir. 1988); Chemical Design v. American Standard, 847 S.W.2d. 488, 491 (Mo.App.1993); Young v. Fulton Iron Works Co., 709 S.W.2d.

---

[7]The specifics of the notice given to the employees is not evidenced before the Court by either party. However, notice to the employees is not a point of dispute, so the Court will assume, for purposes of the instant summary judgment motion, that sufficient notice of the asset sale was given to the employees.

[8]Plaintiff's entire responsive pleading to the instant summary motion focuses on the Court's application of the "mere continuance" exception to Missouri's general rule of non-liability for an asset purchaser. The Court determines that plaintiff has conceded that the other exceptions to Missouri's general rule of non-liability for an asset purchaser are not at issue in this case.

927, 938 (Mo.App. 1986).[9] There are four (4) exceptions to this general rule of nonliability: 1) where the purchaser expressly or impliedly agrees to assume the debts or liabilities of the transferor; 2) where the transaction amounts to a merger or consolidation; 3) where the purchasing corporation is merely a continuation of the selling corporation; or 4) where the transaction is entered into fraudulently for the purpose of escaping liability for the debts and liabilities of the transferor. Medicine Shoppe, at 803; ARE Sikeston, at 828; Chemical Design, at 493. As stated earlier, the only exception at issue here is whether defendant FMF is a mere continuation of Dahlstrom Industries.

In determining whether the successor corporation is a "mere continuance" of the predecessor corporation, several factors are considered: 1) whether there is common identity of officers, directors, and stockholders; 2) whether the incorporators of the successor also incorporated the predecessor; 3) whether the business operations are identical; 4) whether the transferee uses the same trucks, equipment, labor force, supervisors, and name of the transferor; and 5) whether notice has been given of the transfer to employees or customers. Medicine Shoppe, at 804; Roper Elec.Co. v.Quality Castings, Inc., 60 S.W.3d. 708, 711-13 (Mo.App. 2001). Although none of these factors are determinative in the mere continuation analysis, the first factor - common identity of officers, directors, and stockholders - is a "key" factor. Helms

---

[9]Although no Missouri court has specifically addressed whether successor liability may attach to a successor that acquires substantially all, but less than the totality of assets; the Court in Medicine Shoppe, *supra.* determined that a finding that a "substantial amount" of the transferor's assets were sold/transfer to the transferee was sufficient to invoke Missouri's general rule of nonliability as expressed in Chemical Design, *supra.*

v. Prime Tanning Corp., 2010 WL 1935952, *10 (W.D.Mo. May 11, 2010) *citing* Flotte v. United Claims, Inc.[10]

After careful review of the parties' pleadings, submitted exhibits, and relevant caselaw, and viewing same in a light most favorable to the plaintiff, the Court finds that the overwhelming evidence demonstrates that defendant FMF is not a continuation of Dahlstrom. The plaintiff's strong reliance on Roper, *supra.* in support of its argument for the application of the continuance exception is misplaced.

This Court agrees with the summation of the Roper case set out in Boycom Cable Vision, Inc. v. Howe, et. al., 2006 WL 2727984, *5 (E.D.Mo. September 22, 2006).

> "In *Roper*, the successor corporation retained three shareholders and key employees of the predecessor corporation as employees. The Missouri Court of Appeals for the Southern District held that the lack of identity of officers, directors, and shareholders between the predecessor and successor corporations was not fatal to the plaintiff's effort to collect a debt from the successor corporation. The Court found that sufficient evidence supported the trial court's judgment imposing liability on the successor corporation. The Court relied on the following evidence in reaching its conclusion: all of the assets of the predecessor were transferred; the successor retained all of the predecessor's employees without notifying them of any change in ownership; the plaintiff was not notified of the change in ownership; the successor continued the exact same business using the same equipment and had the same customers as the predecessor; the customers were not notified of the change; the successor used the same trade name; the successor retained the key employees in management positions; the successor took over the works in progress of the successor and collected the accounts receivable; the successor operated in the same location and had the same phone number; the successor gave stock ownership to two of the retained key employees within fifteen months of the transfer; and the successor intended the transfer to be temporary and planned to sell the corporation back to two shareholders of the predecessor after a certain amount of time."

---

[10]The Court will cite only to those unpublished opinions that significantly assist the Court in addressing the pending legal issue(s).

Boycom Cable Vision, at *5 (internal citations omitted) *citing* Roper, *supra.*

The primary holding of the Roper case is simply that the **lack of identity of officers, directors, and shareholders** between the predecessor and successor corporations is not fatal to a plaintiff's claim of successor liability under the mere continuation exception. Based upon this legal finding, and other significant facts, the Roper Court found liability. However, the facts of Roper are easily distinguishable from the facts in the instant case.

It is undisputed that there is no common identity of officers, directors, and shareholders between Dahlstrom and defendant FMF.[11] There is evidence that a few employees, including three (3) key employees were retained by FMF. However, these employees held no stock in FMF, no ownership interest in FMF, no influence with the Board of Directors of FMF. They were hired pursuant to new employment contracts with FMF with new terms and conditions of employment. *See*, Wallace v. Dorsey Trailers Southeast, at 343 (retained employees with new employment contracts not indicative of successor corporation being mere continuation); Young, at 941; Brockman, at 798-99; *see also*, ARE Sikeston, at 829 (although some employees were retained by the successor corporation, evidence showed that successor corporation was separate entity with own organization, directors, and shareholders). Even if the Williamsons and Lowther were hired into "titled" positions, they reported to a FMF supervisor. The evidence viewed most favorably to plaintiff simply does not rise to the level of showing any involvement by the former Dahlstrom employees in management of FMF. *See,* Chemical Design, at 493. It is undisputed that notice of the sale was given to employees, vendors and customers. It is undisputed that the incorporators of FMF did not incorporate Dahlstrom. There is no evidence that the same trucks

---

[11]The Court's findings supporting its ultimate holding that defendant FMF is not the mere continuation of Dahlstrom is equally applicable to Formtek, Inc. and Mestek, Inc.

or a substantial majority of Dahlstrom's employees (notwithstanding the identified five employees) were utilized by FMF.

The business operations were not identical. There is no evidence that FMF (or at the time, Formtek, Inc.) was created specifically to acquire Dahlstrom's roll-forming and flexible fabrication businesses. Young, at 941. Dahlstrom stopped using the "Dahlstrom" name but incorporated under a new name and continued in business for some period of time. Defendant FMF did use the Dahlstrom name but only as a brand name for the acquired roll-forming and flexible fabric fabrication businesses. The purchase of assets and the continuation to manufacture certain products is not evidence of "mere continuation" especially in light of the fact that there are no common officers, directors, or shareholders between Dahlstrom and FMF. Chemical Design, at 493 *citing* Young, at 941. Any vendor of Dahlstrom that wanted to continue a business relationship with FMF had to complete new credit application and be subjected to a business review by FMF as to " business compatibility".

Although the plaintiff appears to ignore the fact that there was a limitation of liability clause in the APA, the Court cannot discount it. The APA clearly and unequivocally waives any liability on the part of FMF for any machinery manufactured prior to August 8, 1996. Thus, the lack of express or implied assumption of liabilities is another strong factor for determining that FMF was not a mere continuation of Dahlstrom by virtue of the 1996 APA. *See*, K.C., 1986 Limited Partnership v. Reade Manufacturing, 472 F.3d. 1009, 1025 (8th Cir. 2007); Wallace, at 343.

Finally, the existence of a non-compete clause in the APA is not indicative of mere continuance by FMF. Plaintiff fails to cite any caselaw demonstrating that this factor is indicative of whether FMF is a mere continuation of Dahlstrom, or is even a factor to be

considered at all. *See*, Helms v. Prime Tanning Corp., *supra.* (the fact that APA contained a non-compete clause did not preclude the Court from finding non-successor liability due to other factors such as lack of common identity of officers, directors, and shareholders).

This Court deduces, and the plaintiff has not produced evidence showing otherwise, that Missouri still "adheres to the concept that the phrase `continuation of the corporation' should be *literally* applied to the continuation of the corporate organization, management, and operations, rather than merely the continuation of the enterprise or the product line." Chemical Design, at 493; *see*, ARE Sikeston, at 829 *quoting* Chemical Design, *supra*. Although FMF continued to manufacture some of the products of Dahlstrom (but not the machinery that injured the plaintiff), the overwhelming evidence shows a "clear line of demarkation separating the corporate structure, organization, and management" of Dahlstrom and FMF. *See*, Chemical Design, at 493.

Upon review of all evidence in a light most favorable to the plaintiff, the Court finds that no issues of material fact exist and that as a matter of law FMF did not become a "mere continuation" of Dahlstrom via the 1996 APA. Thus, the general rule of nonliability for an asset purchaser is applicable to defendant FMF. Defendant FMF cannot be held liable as a successor-in-interest under Missouri's general rule for asset purchasers, and no exceptions to that general rule are applicable in this case.

Dated this __25th__ day of March, 2011.

_____
UNITED STATES DISTRICT JUDGE